# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:09CR420 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| JAMES G. SUMMERS, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant James G. Summers (Summers) (Filing No. 23). Summers is charged in the Indictment with a conspiracy to distribute methamphetamine (Count I) in violation of 21 U.S.C. § 846, the possession with intent to distribute methamphetamine (Count II) in violation of 21 U.S.C. § 841(a)(1), and a forfeiture of $2,550 in U.S. currency (Count II) in violation of 21 U.S.C. § 853. Summers seeks to suppress evidence obtained following a traffic stop by Trooper Paul Hazard (Trooper Hazard) of the Nebraska State Patrol (NSP) on September 27, 2009, in Wood River, Hall County, Nebraska.

The court held an evidentiary hearing on the motion on January 14, 2010. Summers was present for the hearing along with his counsel, Chad D. Primmer. The United States was represented by Assistant U.S. Attorney Thomas J. Kangior. During the hearing, the court heard the testimony of NSP Paul Hazard, passenger Joshua Just (Just), and the defendant, Summers. The court also received into evidence a copy of a DVD of the traffic stop (Exhibit 1), and a sketch of the traffic stop area (Exhibit 2). A transcript (TR.) of the hearing was filed on January 21, 2010 (Filing No. 37).

## FINDINGS OF FACT

Around 7 p.m. on September 27, 2009, Trooper Hazard was on duty in his marked patrol unit in Wood River, Nebraska (TR. 8; 28). Trooper Hazard's patrol unit has a camera mounted inside from the roof in the front seat passenger area (TR. 9). The camera is activated whenever the patrol unit's emergency lights are activated (TR. 9). Having received intelligence information from a Kearney Police investigator that Summers was

conducting drug business from Summers' residence above a hardware store on Main Street in Wood River, Trooper Hazard parked his patrol vehicle in a used car parking lot across the street from Summers' residence to monitor activity from that location (TR. 11). Trooper Hazard estimated he was stationed approximately one hundred yards from the front of the hardware store (TR. 11). Trooper Hazard was informed that Summers drove a black Dodge Dakota pickup (TR. 11). Before Trooper Hazard set up his surveillance of the hardware store, he drove around the neighborhood and observed a black Dodge Dakota pickup parked in the alley near the hardware store (TR. 11-12).

Shortly after taking up his surveillance position, Trooper Hazard observed the black Dodge Dakota cross the roadway from the alley to the Casey's General Store parking lot which was located across Highway 30 just north and east of Trooper Hazard's location (TR. 12). Trooper Hazard observed a male get out of the Dodge Dakota and enter the convenience store (TR. 13). That person returned to the Dodge Dakota, whereupon the Dodge Dakota began moving by going southbound in the parking lot, coming to a stop at Highway 30, and then making a right turn onto Highway 30 without signaling (TR. 13). As the Dodge Dakota began moving in the convenience store parking lot, Trooper Hazard began to move his patrol vehicle in order to follow the Dodge Dakota and was able to observe the lack of a signal from the front of the Dodge Dakota (TR. 14). As the Dodge Dakota turned onto Highway 30, Trooper Hazard also observed the rear of the Dodge Dakota and did not observe a turn signal (TR. 14). After the Dodge Dakota completed its turn, Trooper Hazard caught up to the Dodge Dakota and activated the patrol car's emergency lights (TR. 14).

The Dodge Dakota pulled over to the side of the road and Trooper Hazard walked to the stopped vehicle and made contact with the occupants (TR. 16). The driver was Summers and Just was riding in the front passenger seat (TR. 16). Trooper Hazard was acquainted with Just from a previous traffic stop in which Just was leaving a residence from which Trooper Hazard had seized a methamphetamine lab, and Trooper Hazard had received other information with regard to Just's methamphetamine dealings (TR. 16). Trooper Hazard had Summers come back to the patrol vehicle where Trooper Hazard conducted a license status check, a warrant check, and a criminal history check (TR. 17). Trooper Hazard testified Summers showed signs of impairment (TR. 17). Trooper Hazard

noted Summers appeared to have extreme cottonmouth and body tremors through his shoulders (TR. 17). Summers was perspiring from his lips and upper hairline (TR. 17). Trooper Hazard asked Summers if he had used any type of drugs (TR. 18). Summers told Trooper Hazard he had not used any narcotics but had used Aleve or Advil for a severe headache (TR. 18). Upon further questioning by Trooper Hazard, Summers stated he took some medication to help him sleep (TR. 18). Trooper Hazard then asked Summers if Summers would be willing to complete some field sobriety tests (TR. 18). Summers complied and failed the tests (TR. 20). Trooper Hazard placed Summers under arrest for driving under the influence of drugs (TR. 20).

Following his arrest, Summers was interviewed by Trooper Hazard during which he made various admissions (TR. 20-21). Later, Summers signed a form which gave Trooper Hazard consent to search Summers' residence (TR. 25). After an initial search of the residence, Summers' girlfriend brought the keys to Summers' car at the residence and gave them to Summers (TR. 26). The keys were then used to open the car and a pound of methamphetamine was found in the car (TR. 26).

Just testified that he thought Summers had used his turn signal to turn onto Highway 30 on the evening of September 27 (TR. 55). Summers testified he had used methamphetamine on the evening of September 27, but he knew he had used his turn signal that evening while turning onto Highway 30 (TR. 65).

The court considered the credibility of the witnesses taking into account their demeanor while testifying and their mental and physical condition on the night of September 27. The court credits the testimony of Trooper Hazard and finds that Trooper Hazard reasonably believed he observed the Dodge Dakota turn onto Highway 30 without using its turn signal.

**LEGAL ANALYSIS**

Summers seeks to suppress his post-arrest confession and the evidence obtained from the search of his residence and car. Summers contests this evidence as the fruit of an illegal traffic stop by Trooper Hazard. Summers does not contest that Summers was not given his *Miranda* warnings, that Summers' confession was involuntary, or that Summers' consent to search his residence or car was involuntary (TR. 47).

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. ***United States v. Long***, 532 F.3d 791, 795 (8th Cir. 2008) (**citing *Pennsylvania v. Mimms***, 434 U.S. 106, 109 (1977)). An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. ***Long***, 532 F.3d at 795; ***United States v. Chatman***, 119 F.3d 1335, 1340 (8th Cir. 1997) ("[T]he stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot.") (internal quotation omitted). Trooper Hazard observed a traffic violation in that the Dodge Dakota did not signal its turn onto Highway 30. The court credits Trooper Hazard's testimony and action on the evening of September 27. The traffic stop was legal and the subsequent events of Summers' arrest, confession, and consent to search did not violate Summers' constitutional rights.

The motion to suppress should be denied.

## CONCLUSIONS OF LAW

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Summers' motion to suppress ([Filing No. 23](#)) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendations shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendations. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 9th day of March, 2010.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge